NICHOLAS & Co. *et al. v.* UNITED STATES (No. 1594). SHAW & Co. *et al. v.* UNITED STATES (No. 1602).[1]

1. CONSTRUCTION—PARAGRAPH E OF SECTION 4, TARIFF ACT OF 1913.
    The plain, explicit, and unequivocal purpose of paragraph E of section 4, tariff act of 1913, is that whenever a foreign power or dependency or any political subdivision of a government shall give any aid or any advantage to exporters of goods imported into this country therefrom, whereby they may be sold for less in competition with our domestic goods, the duties on them shall be increased to that extent. It is the *result* of such aid or advantage that Congress seeks to countervail, regardless of whatever name or in whatever manner or form or for whatever purpose it was given. Whether the thing done be called "allowance," "bonification," "bounty," "grant," "drawback," or what, matters not. The question is whether or not the result would be to admit the merchandise to our markets at a lower cost price.

2. COUNTERVAILING OF BRITISH "ALLOWANCE" PAID TO EXPORTERS OF SPIRITS.
    An "allowance" paid by the United Kingdom to the exporter of spirits is a "bounty or grant" within the meaning of paragraph E of section 4, tariff act of 1913, and justifies the imposition of the countervailing duty provided for by the paragraph.

United States Court of Customs Appeals, May 12, 1916.

APPEAL from Board of United States General Appraisers, G. A. 7758 (T. D. 35595).

[Affirmed.]

*Comstock & Washburn (Albert H. Washburn* of counsel) for appellants in 1594; *W. P. Preble* for appellants in 1602.

*Bert Hanson,* Assistant Attorney General (*John J. Mulvaney,* special attorney, of counsel), for the United States.

---

[1] Reported in T. D. 36426 (30 Treas. Dec., 857).

[Oral argument Feb. 9, 1916, by Messrs. Washburn and Preble and Mr. Mulvaney.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court:

This appeal presents for determination the question of the legality of a countervailing duty levied upon spirits imported into the United States from the United Kingdom of Great Britain and Ireland. The countervailing duty was assessed in addition to the regular duties under the provisions of paragraph E of section 4 of the tariff act of 1913 (38 Stat. L., 114), which reads:

E. That whenever any country, dependency, colony, province, or other political subdivision of government shall pay or bestow, directly or indirectly, any bounty or grant upon the exportation of any article or merchandise from such country, dependency, colony, province, or other political subdivision of government, and such article or merchandise is dutiable under the provisions of this act, then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this act, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. The net amount of all such bounties or grants shall be from time to time ascertained, determined, and declared by the Secretary of the Treasury, who shall make all needful regulations for the identification of such articles and merchandise and for the assessment and collection of such additional duties.

On May 25, 1914 (T. D. 34466), the Secretary of the Treasury ascertained, determined, and declared, with due pertinent regulations, that the United Kingdom of Great Britain and Ireland paid or bestowed on plain British spirits 3d. and on British compounded spirits 5d. per gallon, computed at hydrometer proof, and directed countervailing duties conformably levied. This importation was subsequently made at the port of New York and duties accordingly assessed by the collector of customs at that port. The importers duly protested.

The protests were overruled by the Board of General Appraisers, whereupon the importers appealed to this court praying a reversal of that judgment.

The laws of Great Britain, the foundation of the action of the collector, originated with the act of Parliament granting excise duties on British spirits and on spirits imported from the Channel Islands of August 28, 1860 (23 and 24 Vict., ch. 129).

Section 1 of that act levied duties upon every gallon of spirits of the strength of hydrometer proof which on and after certain dates therein mentioned were or should be distilled within the United Kingdom, or which having been distilled therein were on said dates in the stock or possession of any distiller, or in any duty-free warehouse, or in removing to such warehouse, and which should be after the

several named days taken out for consumption within the United Kingdom.

Section 4 of the act provided:

IV. In consideration of the loss and hindrance caused by excise regulations in the distillation and rectification of spirits in the United Kingdom, there shall be paid to any distiller *or proprietor* of such spirits *on the exportation* thereof from a duty-free warehouse or *on depositing the same in* a customs warehouse on or after the fifth day of March, one thousand eight hundred and sixty, the allowance of twopence per gallon computed at hydrometer proof, and to any licensed rectifier who, on or after the said last-mentioned day, has or shall have *deposited* in a customs warehouse spirits distilled and rectified in the United Kingdom the following allowances—that is to say, on rectified spirits of the nature of British compounds not exceeding eleven degrees over proof as ascertained by Sykes's hydrometer an allowance of threepence per gallon, and on spirits of the nature of spirits of wine an allowance of twopence per gallon, such gallons being computed, respectively, at hydrometer proof.

In 1865 these provisions were amended by section 12 of the act of Parliament (28 and 29 Vict., ch. 98), as follows:

SECTION 12. The allowance of threepence per gallon granted by section four of the act passed in the twenty-third and twenty-fourth years of Her Majesty's reign, chapter one hundred and twenty-nine, to any licensed rectifier in respect of rectified spirits of the nature of British compounds not exceeding eleven degrees over proof, as ascertained by Sykes's hydrometer, shall be payable to any licensed rectifier or compounder in respect of any compound spirits *deposited* under the provisions of this act in any warehouse of customs *or* excise, and *exported to* foreign parts, or used in a customs warehouse for rectifying wines or for any other purpose to which foreign or colonial spirits may be applied under the laws or regulations of the customs; but such allowance shall not be paid until the certificate from the proper officer of customs shall be produced to the officer of excise appointed to pay the said allowance, that such spirits have been *actually exported* or *used* as aforesaid.

In 1880 Parliament (43 and 44 Vict., ch. 24) amended all previous acts relating to the manufacture, sale, exportation, and use and dutiability of spirits in Great Britain by an act entitled "The spirits act, 1880." This act provided also for various warehouses. Pertinent provisions thereof are as follows:

"Spirits" means spirits of any description, and includes all liquors mixed with spirits, and all mixtures, compounds, or preparations made with spirits.

　*　　　*　　　*　　　*　　　*　　　*　　　*

"British spirits" means spirits liable to a duty of excise.

　*　　　*　　　*　　　*　　　*　　　*　　　*

"Plain spirits" means any British spirits (except low wines and feints) which have not had any flavor communicated thereto or ingredient or material mixed therewith.

　*　　　*　　　*　　　*　　　*　　　*　　　*

"Spirits of wine" means rectified spirits of the strength of not less than 43 degrees above proof.

　*　　　*　　　*　　　*　　　*　　　*　　　*

"British compounds" means spirits redistilled or which have had any flavor communicated thereto, or ingredient or material mixed therewith.

　*　　　*　　　*　　　*　　　*　　　*　　　*

"Methylate" means to mix spirits with some substance in such manner as to render the mixture unfit for use as a beverage, and "methylated spirits" means spirits so mixed to the satisfaction of the commissioners.

\*      \*      \*      \*      \*      \*      \*

"Warehouse" means any warehouse approved or provided for the deposit of spirits.

"Distiller's warehouse" means an approved warehouse on the premises of a distiller.

"Excise warehouse" means a warehouse approved or provided by the commissioners as a general warehouse for the deposit of spirits.

"Customs warehouse" means a warehouse approved or provided by the commissioners of customs for the deposit of spirits.

\*      \*      \*      \*      \*      \*      \*

13. (1) Every distiller must, to the satisfaction of the commissioners, provide a spirit store and cause it to be properly secured.

(2) The spirit store must be kept locked by the officer in charge of the distillery at all times except when he is in attendance.

\*      \*      \*      \*      \*      \*      \*

45. Subject to the prescribed regulations and the prescribed security, spirits may be removed from a distiller's spirit store *for exportation* or for ship's stores without payment of duty.

\*      \*      \*      \*      \*      \*      \*

49. (1) A distiller may provide a warehouse on his premises for warehousing spirits distilled on the same premises without payment of duty.

(2) Every such warehouse must be approved by the commissioners and entered by the distiller.

50. (1) The commissioners may approve excise warehouses for warehousing spirits *without payment of duty.* Such warehouses shall be for the general accommodation of persons desiring to warehouse spirits.

\*      \*      \*      \*      \*      \*      \*

54. The commissioners may, if they think fit, themselves provide excise warehouses and may charge for spirits warehoused therein, warehouse rent at the prescribed rate, not exceeding 1 penny per week for 40 gallons. This rent must be paid by the *proprietor* of the spirits to the collector, and shall be a lien on all spirits warehoused in the same warehouse belonging to such proprietor.

\*      \*      \*      \*      \*      \*      \*

57. Where a distiller has given the prescribed security under which *he may remove spirits from one warehouse to another*, he may, subject to the provisions of this act and to the prescribed regulations, remove any spirits directly from his store to an excise or customs warehouse, and all spirits so removed shall be deemed to have been first warehoused in the distiller's warehouse and removed therefrom under the provisions of this act.

\*      \*      \*      \*      \*      \*      \*

62. Spirits in a distiller's warehouse may, on the prescribed security being given by the distiller, *be transferred to a purchaser*, but no further transfer may be made of them remaining in the same warehouse.

63. British spirits warehoused in an excise warehouse in the *name of a distiller* or *dealer* may be transferred into the *name of a purchaser* on his producing to the officer in charge of the warehouse a written order for the delivery thereof signed by the proprietor of the spirits and countersigned by the proprietor or occupier of the warehouse or his servant acting for him at the warehouse. Spirits so transferred shall be discharged from all claim in respect of duties, penalties, or forfeitures to which the transferor is liable, but *may not be delivered out of the warehouse for home consumption until payment of the duties* chargeable thereon.

\*      \*      \*      \*      \*      \*      \*

72. Subject to the provisions of this act, spirits warehoused may, in accordance with the prescribed regulations, and on the prescribed security being given, and at the risk of *the proprietor thereof*, be removed to any other warehouse except a distiller's warehouse.

\* \* \* \* \* \* \*

75. (1) Spirits may be delivered from *a warehouse* for home consumption after the full duty chargeable thereon has been paid.

\* \* \* \* \* \* \*

79. Where British spirits are delivered *from a customs warehouse for home consumption*, and in all cases where duty is payable on such spirits in such warehouse, the duty payable shall be collected according to the laws and regulations for like spirits in an excise warehouse by the officers of customs under the direction of the commissioners of customs and paid into the Bank of England to the account of the receiver general of inland revenue and dealt with as other duties of excise.

80. Where foreign spirits are delivered *from an excise warehouse for home consumption* the duty payable thereon shall be collected by an officer under the direction of the commissioners *according to the laws and regulations for like spirits in a customs warehouse*, and paid into the Bank of England to the account of the commissioners of customs and dealt with as other duties of customs.

81. (1) *The proprietor of spirits* in a distiller's or excise warehouse may, on giving notice and the prescribed bond, remove the spirits *for exportation without payment of duty*.

82. Spirits warehoused may, on the prescribed bond being given, subject to the prescribed regulations and subject to the conditions, regulations, and restrictions required by any act in force for the time being, be delivered out without payment of duty *for ship's stores*.

83. Spirits warehoused may, on the prescribed bond being given, subject to the prescribed regulations, be delivered out without payment of duty *for methylation*.

\* \* \* \* \* \* \*

95. (13) Spirits warehoused for exportation or ship's stores under this section must not be delivered out otherwise than directly from the warehouse to the ship in which they are to be exported or used as stores.

\* \* \* \* \* \* \*

117. (1) Methylated spirits shall, subject to the provisions of this act, be exempt from duty.

(2) If a rectifier methylates duty-paid spirits he shall be allowed *a drawback* at the rate of duty chargeable on British spirits of the like strength.

\* \* \* \* \* \* \*

123. (5) Foreign spirits may not be used for methylation until the difference between the duty of customs chargeable thereon and the duty of excise chargeable on British spirits has been paid.

By an act to grant certain duties of customs and inland revenue, August 6, 1885 (48 and 49 Vict., ch. 5, sec. 3), it was further provided:

3. (1) Where any spirits distilled and rectified in the United Kingdom *are exported* from an excise or customs warehouse or are used in any such warehouse for fortifying wines, or for any other purpose to which foreign spirits may be applied, there *shall be paid* in respect of every gallon of such spirits, computed at hydrometer proof, the following allowances, that is to say, in respect of plain British spirits and spirits of the wine, an allowance of twopence, and in respect of British compounded spirits, an allowance of fourpence.

(2) The allowance *shall be paid*, in the case of spirits exported, *to the person who shall have given security for the exportation*, and in the case of spirits used in warehouse, to the *person upon whose written request the spirits shall have been so used*.

The finance act of May 30, 1895 (58 Vict., ch. 16, secs. 6 and 7), enacted:

6. Regulations of the commissioners of inland revenue, under section 159 of the spirits act, 1880, may regulate the removal *for exportation* of methylated spirits, and where spirits used for methylation are removed from a place of methylation and exported in accordance with those regulations, there shall be paid *to the exporter* an allowance of 2 pence for every gallon of such spirits, computed of hydrometer proof, and subsection 3 of the customs and inland revenue act of 1885 shall apply, as if the spirits were exported and the allowance made in pursuance of that section.

7. After the 31st day of December, 1895, section 119 of the customs consolidation act, 1876 (which limits the *time for the payment of a drawback* on the exportation of goods), *shall extend to the payment of any allowance* in respect *of spirits exported, used, or deposited,* which is payable under section 3 of the customs and inland revenue act, 1885, as amended by section 21 of the revenue act, 1889, *and to an allowance* in respect of methylated spirits *exported* which is payable under this act, *and* to the *payment of any drawback* of excise which is *allowed on the exportation of any goods,* in like manner as if it were in terms made applicable thereto, and the date of user or deposit were the date of shipment.

The finance act of July 22, 1902, fixed the rates herein applied by the collector. Section 5 thereof, subdivision 1, reads:

5. (1) As from the 17th day of June, 1902, the customs duty of 10 shillings and 4 pence on imported spirits, imposed by section 7 of the customs and inland revenue act, 1881, shall, as respects spirits other than rum and brandy, be 10 shillings and 5 pence, and the allowance of 2 pence and 4 pence *payable* in respect of spirits under section 3 of the customs and inland revenue act, 1885, and section 6 of the finance act, 1895, shall be respectively 3 pence and 5 pence.

Section 8, subdivision 1 thereof, relates to and permits the withdrawal from warehouse of other than methylated goods to be used in manufactures:

8. (1) Where, in the case of any art or manufacture carried on by any person in which the use of spirits is required, it shall be proved to the satisfaction of the commissioners of inland revenue that the use of methylated spirits is unsuitable or detrimental, they may, if they think fit, authorize that person to receive spirits without payment of duty for use in the art or manufacture upon giving security to their satisfaction that he will use the spirits in the art or manufacture, and for no other purpose, and the spirits so used shall be exempt from duty: *Provided,* That foreign spirits may not be so received or used until the difference between the duty of customs chargeable thereon and the duty of excise chargeable on British spirits has been paid.

Regulative thereof is subdivision 1 of section 1 of the act of August 4, 1906 (6th Ed. VII, ch. 20), reading:

1. (1) Where any spirits are used by an authorized methylator for making industrial methylated spirits, or are received by any person for use in any art or manufacture under section 8 of the finance act, 1902, the like allowance *shall be paid* to the authorized methylator *or to the person by whom the spirits are received,* as the case may be, in respect of those spirits *as is payable on the exportation* of plain British spirits, and the commissioners may by regulations prescribe the time and manner of the payment of the allowance and the proof to be given that the spirits have been or are to be used as aforesaid.

All italics in the foregoing excerpts are ours.

By statute (2d Ed.VII, ch. 7, and 6th Ed. VII, ch. 20, and General Order 20/06), universities, colleges, etc., may receive on bond from a distillery or from an excise or customs warehouse limited quantities of British spirits free of duty, and an allowance of 3d. per proof gallon is granted in respect to such spirits. Ham's Yearbook, 1914 (p. 165).

In addition to the specific provisions for drawback, *supra*, the act of July 22, 1902 (2d Ed. VII, ch. 7, finance act of 1902), in the second schedule, provided generally for "drawbacks to be allowed on articles exported or deposited in any bonded warehouse for use as ship's stores, or removed to the Isle of Man, *if it is proved to the satisfaction of the commissioners of customs that the duties on importation have been duly paid.*"

While the foregoing acts express the system and methods of levy, later enactments fix the present rates. These are shown by Ham's Yearbook of 1914, Exhibit A, being a quasi-official authority published by special permission of the commissioners of customs and excise.

The spirit "allowance" continues as in 1902, 3d. and 5d. per proof gallon, as herein assessed. Ham's Yearbook, 1914 (p. 85).

The excise or internal-revenue duty under the finance acts, 1900, 1904, 1905, 1907, and 1910, is per proof gallon, 14s. 9d. Ham's Yearbook, 1914 (p. 88.)

The import duty upon spirits per proof gallon if imported in casks is .15s. 1d. to 15s. 3d.; if imported in bottles, 16s. 1d. to 16s. 3d. Ham's Yearbook, 1914 (third part, p. 149).

The conspicuously pertinent matters presented by the foregoing legislative status may be epitomized as follows: There are three kinds of warehouses: (1) A crown or customs warehouse owned by the Government; (2) an excise or general warehouse owned by someone not a distiller and controlled by the Government; (3) a distiller's private warehouse controlled by the Government. That from each of these warehouses spirits may be removed for export without paying duty; but if the "allowance" is to be paid they must be removed from one of the two former only and be taken direct to the ship for exportation or as stores; that goods for home consumption may be removed from any one of these warehouses upon payment of the duties; that all goods, including those for export, may be sold and transferred while warehoused; and, *when the "allowance" is paid upon exportation it is paid to the owner or proprietor and not the manufacturer or distiller* unless the latter be the exporter. So with goods delivered for ships' stores, for methylation or university use the "allowance" is paid to the seller. Upon all potable spirits manufactured and consumed in Great Britain there is laid an inland

revenue tax of 14s. 9d. per proof gallon. Upon all such imported in casks 15s. 1d. to 15s. 3d., and in bottle 16s. 1d. to 16s. 3d. per proof gallon import duty is laid. *Upon exportation such British spirits are relieved of all inland revenue tax and in addition thereto an "allowance" is paid out of the public treasury to the exporter of 3d. per gallon if pure spirits and 5d. per gallon if compounded.* Wherefore, the manufacturer, distiller, dealer, or exporter can place his goods in a foreign country at less home cost than he could in his domestic market; although, by reason of the import duty being higher than the excise charged, he is protected in his home market to the extent of that difference.

It must be borne in mind that this appeal concerns only the "allowance" paid exporters of 3d. and 5d. and not the excise duty of 14s. 9d, which latter is never paid upon spirits exported from the United Kingdom of Great Britain. The status of the latter is not here in question.

This appeal presents the question, Is the former payment a "direct or indirect bounty or grant" within paragraph E of section 4 of the tariff act of 1913 (38 Stat. L., 114), *supra?* We think it is, and so hold.

While the briefs and oral argument of counsel for the importers are largely confined to and contend for the narrower use of the word "bounty" as controlling herein, the word "grant," equally a part of the statute and not so confined in amplitude, is but little discussed. The difference in the scope of the words "bounty" and "grant" was elaborately treated in an opinion by Judge Somerville, as a member of the Board of General Appraisers, and later adopted as the opinion of the Circuit Court of Appeals, Fourth Circuit, in Downs *v.* United States (113 Fed., 144), in passing upon section 5 of the tariff act of 1897 (30 Stat. L., 151), which was the predecessor paragraph of this and employed these exact words. The fact that the word "bounty" alone appeared in the similar provisions of the tariff acts of 1890 (26 Stat. L., 567), paragraph 237, and 1894 (28 Stat. L., 509), paragraph 182½, relating to countervailing duties upon sugar, was by Congress in the later and present acts supplemented by the additional word "grant" is significant of a purpose to extend the latitude of the provision. The familiar rule of statutory interpretation which accords every word of a statute a distinct and different meaning requires that some force and meaning be given the word "grant" beyond and in addition to that enjoyed by the word "bounty." Market Co. *v.* Hoffman (101 U. S., 112, 115); Stephens *v.* Cherokee Nation (174 U. S., 445). A statute will not be construed so as to virtually expunge a distinct member of a sentence. Adams *v.* Woods (2 Cranch, 6 U. S., 336).

Whatever the view as to that matter, however, the court is of the opinion that this "allowance" to exporters is well within the words "bounty or grant" as used in said paragraph E. In Downs *v.* United States (187 U. S., 496, 501), the Supreme Court in interpreting the parent paragraph to this, section 5 of the tariff act of 1897 (30 Stat. L., 151, 205), and approving the definitions of "bounty" by Webster and Bouvier (law dictionary), and the Brussels Conference of 1898, stated:

A bounty is defined by Webster as "a premium offered or given to induce men to enlist in the public service; or *to encourage any branch of industry*, as husbandry or manufactures." And by Bouvier, as "an additional benefit conferred upon or *a compensation paid to a class of persons*." In a conference of representatives of the principal European powers, specially convened at Brussels in 1898 for the purpose of considering the question of sugar bounties, the definition of bounty was examined by the conference sitting in committee, who made the following report:

The conference, while reserving the question of mitigations and provisional disposition that may be authorized if need be by reason of exceptional situations, is of opinion that bounties whose abolition is desirable are understood to be *all the advantages conceded to manufacturers and refiners* by the fiscal legislation of the States, and *that, directly or indirectly, are borne by the public treasury*.

 \*  \*  \*  \*  \*  \*  \*

A bounty may be direct, as *where a certain amount is paid upon* the production or *exportation of particular articles*, of which the act of Congress of 1890, allowing a bounty upon the production of sugar, and Revised Statutes, sections 3015–3027, allowing a drawback upon certain articles exported, are examples; or indirect, by the remission of taxes upon the exportation of articles which are subjected to a tax when sold or consumed in the country of their production, of which our *laws, permitting distillers of spirits to export the same without payment of an internal-revenue tax or other burden*, is an example. United States *v.* Passavant (169 U. S., 16).

In United States *v.* Passavant (169 U. S., 16), the Supreme Court, speaking apropos of this subject, declared:

The certificate of facts states that the German duty is imposed on merchandise when "sold by the manufacturers thereof for consumption or sale in the markets of Germany;" and "is collected when the finished product goes into consumption in Germany." As the tax accrues when the manufacturer sells, his wholesale price includes it, and the purchaser who buys these cotton velvets in wholesale quantities in the German markets pays a price covering the tax, and that is the price for the merchandise when bought and sold in those markets.

*Doubtless to encourage exportation and the introduction of German goods into other markets, the German Government could remit or refund the tax, pay a bonus, or allow a drawback.*

And it is found that in respect of these goods when "*purchased in bond, or consigned while in bond, for exportation to a foreign country, this duty is remitted by the German Government,* and is called 'bonification of tax,' as distinguished from being refunded as a rebate." *The use of the word "bonification" does not change the character of this remission.* It is a special advantage extended by government in aid of manufactures and trade, *having the same effect as a bonus* or drawback. To use one of the definitions of drawback, it is "*a device resorted to for enabling a commodity affected by taxes to be exported and sold in the foreign market on the same terms as if it had not been taxed at all.*"

"The law regards the substance, not the shadows, acts done, not the names by which these acts are designated." Whether the thing

done be characterized an "allowance," or "bonification," or "bounty," or "grant," or "drawback," or what matters not. The question for the court is whether or not it is within the class of results sought by Congress to be equalized by this paragraph of the tariff act. That construction must be given the paragraph by the court which will most effectually accomplish its manifest purpose. Arnold *v.* United States (147 U. S., 494, 497).

There is nothing obscure, abstruse, mystic, or even ambiguous about this language, which has been, as to the particular words, a part of all our tariff acts from 1897 to and including the present act. Section 5, tariff act of 1897 (30 Stat. L., 151), section 6, tariff act of 1909 (36 Stat. L., 11), paragraph E of section 4, tariff act of 1913 (38 Stat. L., 114). Its plain, explicit, and unequivocal purpose is: Whenever a foreign power or dependency or any political subdivision of a government shall give any aid or advantage to exporters of goods imported into this country therefrom whereby they may be sold for less in competition with our domestic goods, to that extent by this paragraph the duties fixed in the schedule of the act are increased. It was a *result* Congress was seeking to equalize regardless of whatever name or in whatever manner or form or for whatever purpose it was done. The statute interprets itself as a member of an act calculated to maintain an accorded protection, incidental or otherwise, as against payments or grants of any kind by foreign powers, *resulting* in an equalization thereof to any extent directly or indirectly. Wherefore, in obedience to that obvious purpose, the court does not feel at liberty to adopt any constrained or technical definitions of the words "bounty" or "grant" suggested, but to vouchsafe the paragraph a meaning, well within its language, that will best effectuate the unquestioned congressional purpose.

A great portion of the briefs and record is devoted to an effort to show these payments to exporters of spirits by the United Kingdom to be an equivalent of certain extra costs attending the excise collections. "In consideration of the loss and hindrance caused by excise regulations."

The case of the appellants herein may be said to be well epitomized in Exhibit 6, annex A, which was a document signed on March 1, 1911, by the chairman, deputy chairman, and secretary of the board of customs and excise in London, reading:

The duty on British spirits is very heavy, and involves the necessity of special precautions being taken to prevent any spirit escaping the duty. These precautions include the imposition upon the manufacturer of a number of statutory requirements and restrictions in connection with his plant and methods of manufacture, which considerably increase the cost of manufacture. *The allowances on exportation are intended to be an equivalent and no more than an equivalent of this extra cost.*

This object has been kept in view in fixing the actual amount of the allowances.

The allowances were originally fixed by Mr. Gladstone in 1860 after prolonged consultation between the revenue authorities and the traders affected. The traders were required to formulate their claims in the fullest detail, stating what restrictions in their opinion increased the cost of manufacture and the exact amount of extra cost attributable to each; every item was closely criticized by the revenue authorities, some being disallowed altogether, and others allowed in whole or in part; with the result that the allowances were fixed at a figure which the revenue authorities accepted as not exceeding the loss caused by revenue restrictions.

The fact that the payment made by the foreign government was estimated or calculated upon a certain basis or in consideration of extra burdens imposed by domestic excise laws, or for any other reason of domestic government or policy commending itself to the wisdom of Parliament, is not controlling with our courts. The sole inquiry is, do the results of such acts stimulate exportation or give a special advantage by affording aid from the public treasury whereby such goods may when exported be sold in competition with ours for less. The Supreme Court in Allen *v.* Smith (173 U. S., 389, 402), has concisely characterized bounties and their origin, saying:

Bounties granted by a government are never pure donations, but are allowed either in consideration of services rendered or to be rendered, objects of public interest to be obtained, production or manufacture to be stimulated, or moral obligations to be recognized.

These arguments may well have been addressed as they were to those charged with due adjustment of the added burdens of an excise system, or, possibly, appropriate matters of diplomatic exchanges looking to remedial action, diplomatic or legislative, but the courts must look to the law as enacted and the facts as presented and determine therefrom whether or not the acts done produce results within the terms of the law. If it be true that the excise system delineated intentionally or accidentally results in "an advantage to exporters of spirits to this country from the United Kingdom of Great Britain, which directly or indirectly is borne by the public treasury," or affords "a premium in like manner given or paid to encourage any branch of industry or manufactures," likewise exporting, such falls within this paragraph. Downs *v.* United States (187 U. S., 496, 502). And, it matters not, nor is it made by Congress an exception thereto, that it is an incidental, indirect, or *unintended* result of the British Government's endeavoring to in part repay or compensate its manufacturers and distillers for a burdensome excise system. The courts are concerned with results and not intentions.

Indeed, the efficiency of this instrumentality to recoup the manufacturers and distillers this extra cost is not a little difficult to grasp. The fact that under the acts of Parliament this payment may be made not to the manufacturer or distiller who suffers the extra cost but to *any* purchaser of the spirits while warehoused, who may after purchase withdraw them either for export or consumption, is expres-

sive that the system is at least more heedful of the interests of the exporter who has suffered no extra burdens than of the manufacturer or distiller who has. While business acumen dictates that the presence of the possibility of this payment upon export would impel the distiller or manufacturer to exact that much more for his goods, the fact that they may be sold and transferred while in a warehouse from which they may be withdrawn either for consumption or export denies the manufacturer or distiller the certainty of that knowledge necessary to support or enforce the exaction.

In the view that undoubtedly a more equitable and natural system of recoupment of disbursements, based upon extra expenses incurred by *all* the manufacturers and distillers in manufacturing and distilling *all* spirits produced in Great Britain, would be had by payment to those who suffered the extra cost directly in due proportion instead of to a much more limited and necessarily indefinite number of exporters (including vendors of ship's stores) and "proprietors" selling universities necessarily uncertain quantities of spirits, who did not so suffer, serious doubts naturally arise not only as to due receipt of the repayment by its intended beneficiaries but as to other actual though unintended results of the system. Wherefore, the justification made that the system is one solely in compensation of loss and hindrance caused by excise laws and regulations, which for that reason takes the payments out of paragraph E of section 4 of the tariff act of 1913 (38 Stat. L., 114), loses its effectiveness, as the system is so palpably inadequate therefor and not confined thereto that the contention fails. Of course, with the wisdom and policy of the laws of a sister nation this court is not concerned. We are concerned only with their results upon the commerce of the country as designed to be protected by our duly enacted laws. This examination of the statutes and regulations is had because they seem convincing that their natural commercial operation must utterly fail to insure recoupment of these extra costs to the manufacturers and distillers, whereas they permit exporters and vendors, not suffering such extra costs, to enjoy these payments. The security and certainty of actual repayment to the manufacturer or distiller seem too remote and a pure gift or bonus to the exporter too proximate to support the argument of recoupment made, even were it of force in the case.

Nor does the fact that like payment is made to *proprietors* or manufacturers of foods sold for ship's stores, methylation, and use in the universities change the legal or actual status under our laws of the payments made exporters. As a matter of fact goods for ship's stores are for exportation. As to such the considerations had need not be repeated. An allowance for goods sold universities probably encourages attendance and education by enabling students to pur-

chase them cheaper. That undoubtedly is the result if not the purpose. So the allowance for methylated spirits and goods under section 8 of the finance act of 1902 is in aid and encouragement of manufacturers. But, if that is the result or purpose in such cases, why not so as to exported goods? And if so does not such a payment result in an advantage to and encourage the exporter in foreign competition? And, is that not precisely what Congress sought to equalize by this paragraph? Upon the whole, however, how does the extension of the bounty of a generous government to more than one class of subjects change its character in either case? If A pays B a sum of money without consideration it neither changes nor affects the character of that act should he likewise pay C the same.

One of counsel for the appellants urges that as spirits can only be exported from excise or customs warehouses this payment might upon the ground of added expense of the necessary passing through such warehouses thereby be warranted. There is nothing in the record as to the relative warehouse charges to support the suggestion, and it is contradictory of the theory of the case chiefly relied upon by appellants. It is sufficient to point out that this argument finds its complete refutation by section 59, spirits act of 1880, which reads:

59. The proprietor of any plain spirits *reimported* into the United Kingdom may, on the issue by the commissioners of customs of a bill of store for the spirits, and *on the repayment of the allowance granted on the exportation thereof*, warehouse the spirits in an excise or customs warehouse.

By this paragraph upon reimportation of exported spirits the exporter can rewarehouse them *in either an excise or customs warehouse* and the granted allowance is returned. If the "allowance" is for warehouse charges by *such* warehouses or for "passing through" them because export can only be had therefrom, why return this charge after they have been warehoused therein not only *once* but *twice?*

Incidentally, this status develops the thought that the return to the public treasury of this "allowance" deprives the exporter, or let us say the manufacturer or distiller, of that modicum of allowance due for goods which, having already undergone excise regulations, have had cast upon them this extra cost for which the returned moneys were intended compensation.

This section (59) is further illuminative of the effects of the operation of this excise system as to our industries and tariffs. Thereby it is made apparent that while this payment is made to the *importer* upon "exportation" it is only paid upon that exportation which actually enters our commercial field in competition with the sale and consumption of our spirits; for the section provides that if the exported spirits are returned to the United Kingdom the payment made upon

exportation must be refunded the public treasury. This payment therefore becomes absolute only when the spirits enter export competition. The effectiveness of the act is confined to actual competition in our domestic trade with our goods. It is a payment in truth not upon exportation but upon the spirits entering and remaining in foreign trade. Wherefore, this section 59 of the spirits act of 1880 manifests an ungenerous disregard of the declared beneficent purposes of the act to reimburse for extra costs in that although the "extra costs" of the burdensome excise laws have been sustained in the production and export of the particular spirits, unless they enter and remain in actual foreign competition and trade, although they undergo the additional burden of rewarehousing and its incidental extra costs, such spirits are denied any participation in the afforded relief.

The well-recognized difference between drawback and bounties, grants, or allowances is nowhere more emphasized or exemplified than in the acts of Parliament quoted. The acts and administrative orders of the Kingdom of Great Britain have ever regarded them as separate and distinct. Allowances are direct payments out of the public treasury upon goods usually not previously imported. Drawback is repayment of moneys previously paid in by the exporters upon goods previously imported. These acts are a sufficient answer to the claim herein, were it not otherwise answered and were that of virtue, that these "allowances" are justified as "drawbacks." Whether or not drawback is a bounty or grant is not an issue herein, and as to that the court expresses no opinion. These payments are not drawbacks but direct payments.

Appellants rely upon a uniformity of departmental practice long continued as supporting their protests. Reference is had in that particular to the existence in some form of the statutes of Great Britain from and including the act of 1860. That this Government would be bound by the existence of a statute of Great Britain of which it presumptively has taken, and can take, no notice even in its courts of record unless therein proven, is, in the opinion of this court, without any force. While the first statute of Great Britain upon the subject was passed in 1860, in 1880 there was a general revision of the spirits act, and in 1889 a revision thereof by the finance and revenue acts. Paragraph E of the tariff act of 1913 (38 Stat. L., 114) in its parent, general form first appeared in the tariff act of 1897 (30 Stat. L., 151), was substantially reenacted in 1909 (36 Stat. L., 11), and again in 1913 (38 Stat. L., 114). The changes were as to detail of the bounties and grants alike provided for in each act. Prior thereto there was no general countervailing provision in our tariff laws. The tariff acts of 1890 (26 Stat. L., 567) and 1894 (28

Stat. L., 509) contained such a provision confined to sugar alone. Under the circumstances, admitting the rule contended for, there could be no construction of paragraph E of the tariff act of 1913 (38 Stat. L., 114) until at least the enactment of the tariff act of 1897 (30 Stat. L., 151). It could not be construed before it was enacted. After enactment, as section 5 of the tariff act of 1897 (30 Stat. L., 151), it was not construed as contended for by appellants herein until April 18, 1911 (T. D. 31490). The departmental action negatives rather than supports the contention of appellants. The first interpretation made by the department was January 21, 1911 (T. D. 31229), wherein it held that the payments by the United Kingdom of Great Britain here in question were within the provisions of said section 6 of the tariff act of 1909 (36 Stat. L., 11).

Upon representation, that decision of the Treasury Department was revoked April 18, 1911 (T. D. 31490). On May 25, 1914 (T. D. 34466), the department returned to its original ruling of January 21, 1911. Without other interpretation, of which there was much by the duly constituted tribunals, this alternating practice of approximately three years would not bring appellants within the rule of long continued and uniform departmental practice. Robertson *v.* Downing (127 U. S., 607); Merritt *v.* Cameron (137 U. S., 542, 551); Brennan *v.* United States (136 Fed., 743, 746); United States *v.* Midwest Oil Co. (236 U. S., 459, 476). On the other hand, the construction or interpretation of an inferior Federal court (or reviewing board) prevails over that of an administrative department. Steinmetz *v.* Allen (192 U. S., 543).

Early after the enactment of the parent provision, as section 5 of the tariff act of 1897 (30 Stat. L., 151), and continuously throughout its statutory existence as a part of that act, and of the tariff acts of 1909 (36 Stat. L., 11) and 1913 (38 Stat. L., 114) a uniform construction had been placed thereupon by the Board of General Appraisers and the courts contrary in principle to the contention of the appellants. The first case decided by the Board of General Appraisers was in April, 1898, G. A. 4133 (T. D. 19256), construing section 5 of the tariff act of 1897 (30 Stat. L., 151). The point here in question was not there in issue. In September, 1898, the matter of the amplitude of the parent provision, section 5 of the tariff act of 1897 (30 Stat. L., 151), was reviewed by the Board of General Appraisers, G. A. 4261 (T. D. 20039). The case concerned an excise of 27 florins on raw and refined sugars produced in the Netherlands. There was a protection upon it of 2.12 florins which was deducted from the excise tax upon domestic consumption, while upon exportation no tax was exacted, but at the same time the bounty was paid. The net result was that if the sugar was consumed in Holland it would have paid a tax of 24.78 florins. Upon exportation, however,

no tax was paid and the shipper received a·bonus of 2.12 florins. Pertinently the board said:

> Whatever words may be used to express, explain, or conceal the meaning of the provisions of the Netherlands sugar law * * * whether the bounties are termed deductions, remissions, or excise, or what not—the table we have given *illustrates the result* and shows that the Netherlands *do give a substantial bounty or grant*, indirect if not direct, on the exportation of sugar.

On appeal to the Circuit Court for the Southern District of New York the decision of the board was reversed. Hills v. United States (99 Fed., 425). The Government appealed to the Circuit Court of Appeals, Second Circuit, which reversed the Circuit Court and sustained the board. United States v. Hills Bros. Co. (107 Fed., 107). Judge Lacombe in delivering the opinion took occasion to say:

> . Undoubtedly, this premium or "deduction" *is called* a bounty on production, and is a bounty on production; but the other provisions of the law have the *practical effect of making it,* from the standpoint of other countries, *a bounty on exportation.* The result of the whole act is no different, so far as the foreign country is concerned, from what it would be had it provided: All sugar producers shall receive a bounty paid in cash from the revenues of the Government of so much per 100 kilos. Those who export their sugar may keep this bounty, those who do not export it must forthwith return it to the Government.

Again, in April, 1901, the subject was exhaustively considered by the board in the Russian sugar bounty cases, commencing with G. A. 4912 (T. D. 22984). The facts of this case are available in its ultimate decision by the Supreme Court. Downs v. United States (187 U. S., 496). The board held that the Russian laws were within the provisions of section 5 of the tariff act of 1897 (30 Stat. L., 151). The decision of the board was rendered by Judge Somerville, is one of great merit, and was approved and adopted by the Circuit Court of Appeals, Fourth Circuit, as its opinion. Downs v. United States (113 Fed., 144). Part of the adopted language here pertinent was as follows:

> It is important to observe, in the consideration of this subject, that section 5 of the tariff act of 1897, under which this case arises, *does not use the word "bounty" in any narrow or technical meaning.* It embraces "any bounty or grant" bestowed or conferred by the Government, whether directly or indirectly. The word "grant" is more comprehensive in meaning than the term "bounty." It implies the conferring by the sovereign power of some valuable privilege, franchise, or other right of like character upon a corporation, person, or class of persons. * * * Indeed, *the word "grant," in its broad signification, may well include the remission of a tax already levied and assessed by the authority of government.* * * * *The use of the word "bonification" does not change the character of this remission.* * * * And in making this inquiry it is immaterial in what manner the "bounty or grant" was paid or bestowed. The law regards substances, not shadows; things, not names. * * * Looked at from the Russian standpoint, these advantages might, perhaps, be described as a bounty on production; but (in the language of the Circuit Court of Appeals in the Hills Bros. case, *supra*), "from the standpoint of other countries," they become a bounty or grant on exportation. * * * It is immaterial, we may add, whether

the price obtained for the exported sugar reaped a profit or inflicted a loss upon the manufacturer or producer. *The simple inquiry is whether at whatever price he may have sold it, he received a bounty or grant of pecuniary value upon its exportation.*

The case on certiorari was reviewed by the Supreme Court in Downs *v.* United States (187 U. S., 496). The language of that court affirming the foregoing is even stronger and is quoted *supra*.

In October, 1901, the board again rendered a decision construing this section in G. A. 5012 (T. D. 23325), wherein the issue presented in the Hills Bros. Co. case, *supra*, was reviewed, the protest overruled, and the duty countervailed. That it is the effect or result of the operation of the foreign law and not the name which is ascribed to the payment that controls decision was held in two similar cases arising in G. A. 5306 (T. D. 24306) and G. A. 5592 (T. D. 25035), the latter construing paragraph 393 of the tariff act of 1897 (30 Stat. L., 151), the pertinent part of which was as follows:

393. * * * *Provided,* That if any country or dependency shall impose an export duty on pulp wood exported to the United States, the amount of such export duty shall be added, as an additional duty, to the duties herein imposed upon wood pulp, when imported from such country or dependency.

The board countervailed the duty. On appeal to the Circuit Court, Northern District of New York, Myers *v.* United States (140 Fed., 648, 654), the following pertinent language was used:

It is not called an export duty by that Dominion, but is imposed as a license fee. *The merchandise can not escape our law, because we call it export duty* and Quebec or Ontario calls it a license. *The question is, What is it in effect and in fact?*

The Circuit Court of Appeals affirmed the board and Circuit Court except upon grounds not involving the question herein involved. See Myers & Co. *v.* United States (144 Fed., 1021). Subsequently that line of decisions was followed in Heckendorn *v.* United States (162 Fed., 141). Certiorari to the Supreme Court of the United States was refused. Heckendorn *v.* United States (214 U. S., 514).

All claimed and shown by appellants as to the reason or purpose of this payment and the method or basis adopted for its calculation or estimation may be assumed, and the court accepts it as true. All this, however, stops short of the real issue in the case, which, as stated, is the actual result or effect such action has when the exported spirits enter our markets in competition with our goods.

Whatever may have been the purpose or consideration of the payment made upon exportation of these spirits, the incontrovertible fact is present that it necessarily encouraged their exportation and enabled the exporter to sell them at a proportionately less price in competition with the goods of this country. It is a payment directly to the exporter for and upon exportation and the entry of said goods in our body commerce. The doctrine of the case, therefore, may

be paraphrased from the language of the Supreme Court in Allen *v.* Smith, *supra:*

Whether allowed in consideration of services rendered or to be rendered, or with the object of a public interest to be obtained, production or manufacture to be stimulated, or a moral obligation to be recognized, it is a bounty.

The decision of the Board of General Appraisers is *affirmed.*