(C. D. 1991)

POLLAK INDUSTRIAL CORP.
HENRY POLLAK, INC. } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 29, 1958)

*John R. Rafter; Jordan & Klingaman* (*Jacob L. Klingaman* of counsel), associate counsel; for the plaintiffs.
*George Cochran Doub*, Assistant Attorney General (*Alfred A. Taylor, Jr.*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

FORD, Judge: The merchandise covered by the two suits listed in schedule "A," hereto attached and made a part hereof, was classified by the collector as "Straw hats sewed & colored—Not blocked or trimmed." Duty was levied upon said merchandise at the rate of $2.50 per dozen, plus 25 per centum ad valorem, under paragraph 1504 (b) (4) of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T. D. 52739, and also by T. D. 52857.

Plaintiffs claim said merchandise to be properly dutiable at the rate of $2 per dozen, plus 15 per centum ad valorem, under said paragraph 1504 (b) (4), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, as hat bodies, or hats, partly manufactured, composed wholly or in chief value of straw, blocked, and valued at more than $15 per dozen.

In his brief filed herein, counsel for the plaintiffs limits the claim in these suits as follows:

Though the protests in this case cover four entries, the testimony and exhibits on which plaintiffs rely are related to the straw hat bodies which are described on the following invoices only.

Consular invoice No. 349, dated July 9, 1952, covered by entry No. I. A. 951101.

Consular invoice No. 11,182, dated June 25, 1952, covered by entry I. A. 950361.

The above-specified merchandise was appraised at $24 per dozen, plus packing. There is no contention that the said hat bodies were trimmed. An examination of the samples in evidence fully demonstrates that they are not trimmed. It is established that the material used in these hat bodies is straw braid, called Milan braid.

The issue in this case is, therefore, narrowed to the single question of whether or not the subject hat bodies were blocked prior to importation.

Paragraph 1504 (b) (4) of the Tariff Act of 1930, as modified by T. D. 51802, T. D. 52739, and T. D. 52857, under which the merchandise was classified and assessed, and under which the lower rate of duty is claimed, is as follows:

Hats, bonnets, and hoods, composed wholly or in chief value of straw * * * whether wholly or partly manufactured:

    *        *        *        *        *        *        *

If sewed, whether or not blocked, trimmed, bleached, dyed, colored, or stained:

If wholly or in chief value of straw, and blocked or trimmed and valued at $15 or more per dozen, $2 per doz. and 15% ad val.

Wholly or in chief value of straw, not blocked or trimmed, $2.50 per doz. and 25% ad val.

Other, $3 per doz. and 25% ad val.

This case has been submitted upon a stipulation wherein counsel agreed, in effect, that the depositions of Giuseppi Corti, obtained by means of commissions, may be admitted in evidence in the records of these protests, with the same force and effect as though said Giuseppi Corti had appeared in person and testified before this court. Said stipulation reads in part as follows:

That the imported articles covered by said protests, in their imported condition as represented by Exhibit C, are not in their final shape ready to be worn as hats; that in their imported condition, as represented by said exhibit, they are partly manufactured hats; and that, before becoming wholly manufactured hats, they must be subjected to a blocking process in the United States in the course of which blocking process in the United States they are stiffened with suitable sizing and then pressed into permanent shape by means of blocks and given their final shape and form in which they are ready to be worn as hats.

For a fuller understanding of the processes to which these unfinished hats were subjected prior to importation, the following is quoted from the interrogatories, hereinbefore referred to:

Q. Kindly describe, fully and in detail, each operation in the manufacture of those straw hat bodies, beginning with the first operation in making them from the straw material referred to in your answer to interrogatory No. 7 and continuing with the following operation or operations in making them, and stating, with respect to each operation, whether it was performed by hand or by machine or in part by hand and in part by machine.—A. The first operation is to bleach the braid and after to dye it. When the braids are ready we sew the braids into hats using an ordinary sewing machine. The type of this machine is DRESDENSIA. We use cotton thread. During the sewing we use an aluminum form because the operator in this way controls the size and dimensions of the hats, crown and brim. To control the brim we use a circle corresponding to the width of the brim required. For the crown the aluminum block has a crown of the

dimension required for the hat. At this point the sewing operation is finished. When we sew the hat sometimes the stitch breaks the straw and spills [sic] come out from the braid. These are cut with scissors by hand. After the sewing operation we press the hats with an hydraulic machine using pressure and heat— no steam is used. This is done in order to iron the hat and adjust the size and dimensions. For pressure operations we use an aluminum form and for what concerns the variation of the size and measure we use some circular sections to adjust the size of the form. This completes the operations.

\* \* \* \* \* \* \*

With the two operations of sewing and pressure we make the exact dimensions and sizes requested, but the pressure operation gives to the hats one hundred per cent exactness.

\* \* \* \* \* \* \*

Q. If a form or block of any kind was used in connection with any of the operations which are referred to in your answers to Interrogatories Nos. 9, 10 and 11, kindly describe the form or block which was used in connection with each operation.—A. For sewing we use an aluminum block which has a fixed crown and a brim that can be varied by using some circles according to the dimension of the brim that we have to sew.

We further use another form when we have to press the hats. This too is an aluminum form on which we can vary the crown for depth using some special thicknesses between the brim and the bottom part of the crown. For the part of the brim we use some circles in accordance with the dimension of the brim that we have to press.

\* \* \* \* \* \* \*

Q. Was any form or block, which is referred to in your answer to Interrogatory No. 13, marked with the height of the crown or the width of the brim of the straw hat bodies for whose manufacture it was used?—A. Yes.

Q. If so, please state which such forms or blocks were so marked and whether they were marked with the height of the crown or the width of the brim, or both, of the hat bodies.—A. The form of the crown for sewing is marked with the height and size of the crown; the brim of the form is not marked as the size is determined by the circles inserted. The circles are not marked but are stored according to size; only a few circles are marked.

On the form for pressing the part of the crown is marked with its size and its depth; the circles are marked with their own thickness. The brim is not marked but the circles are marked with the width of the brim.

Q. Was any form or block, which is referred to in your answer to Interrogatory No. 13, marked with the head size of the straw hat bodies for whose manufacture it was used?—A. Yes.

Q. If so, please state which such forms or blocks were marked with the head size of the hat bodies.—A. Both the sewing and pressing forms are marked with the head size.

\* \* \* \* \* \* \*

Q. If you wrote such a letter and have submitted an exact copy thereof to the American Consul, is any blocking operation referred to therein a final blocking which gives to the hats the shapes in which they are ready to be worn or is it a preliminary blocking which gives to the hats their exact dimensions with respect to the height of their crowns and the width of their brims and their exact head sizes but does not give them their final shapes as hats?—A. The hats receive a complete blocking operation. However, the shape that results after this block-

ing is not the shape that is usually worn. The hats can be reblocked on the shape desired by the customer as long as the dimensions are the same.

The following is copied from exhibit X:

* * * We want to refer particularly to the operation that we make after having sewed the hat and after that the spiels resulting of the sewing have been cut off, operation that we describe on the above Interrogatory in the second part of point 9. We say that we put the hat in a hydraulic machine with the respective aluminum block for to give the hat the right size for what concerns crown, height and head size and dimensions of the brim. The block which we use in the hydraulic press is such that it presses the hat in every part, the tip and the sides of the crown, the plane of the brim and even the edge of the brim so the block forces the hat to get a determined dimension exactly corresponding to the block. This, for us means blocking the hat and we want also to add that this operation is called in Italian "bloccare." We do not see what different name or interpretation we could give to this operation, we have not spoken about blocking in point 9 of the Interrogation because we have described the operation that we make to the hat but this simply because for us the signification of blocking was implicitly understood. Sincerely, never before we had occasion to argue about this question but for what is our experience since many years, we know that an operation as we do to your hats is a blocking operation.

One witness for the plaintiffs testified that blocking fixes the crown, height of crown, size of brim, or head opening or head sizes. When asked "* * * if an order prescribes those factors, then of necessity the hat must have been subjected to blocking?" the witness replied: "That's right." The witness was further interrogated and answered as follows:

R. Q. Do you know whether the so-called blocking which you are now attempting to describe not only fixes the height of crown and width of brim but also the head size?—A. Yes.

R. Q. Do you know whether a different size block is used for each different head size which is wanted in the hat?—A. Yes, surely.

Plaintiffs' second witness testified that sizing consists of lacquer; that "We actually take this hat and a man will go into a special room and dip it into a lacquer, it will dry overnight"; that the hat remained in the lacquer solution for only a few seconds, and it was then hung up for drying; that this dipping will tend to take out the shape; that the hat will become distorted; that they then take the hat and once more put it on the die that they originally had before and put the repress on it, repress it into the same shape, so the hat will conform to the original.

When I place an order for Milan hats, for example the hats I order them by sizes, head sizes, I order them by brim widths and by height of crowns. In order for them to do that, they have to block it.

The witness was further interrogated and answered as follows:

Q. Then, the shape of a hat is that determined prior to sizing?—A. Yes, it is.

Q. In sizing, I have reference to the stiffening of the bodies rather than the size of the hat?—A. Yes.

Q. The shape is determined prior to that time?—A. It is.

Q. Is the sizing operation, namely the stiffening, a separate operation from blocking?—A. It is.

Q. Does the operation immediately preceding the sizing for stiffening purposes determine the shape of the hat?—A. It does.

\* \* \* \* \* \* \*

X Q. When you say second pressing, that is a blocking process, isn't it?—A. No, I wouldn't call it a blocking process. The first can be considered more or less of a blocking process; the first pressing, but the second is not. That is only to put the hat back in shape from being distorted in the stiffening. \* \* \*.

Defendant's witness, when asked to describe the process of blocking as he had done it, testified as follows:

Of making a hood similar to this into a hat, I would take the hood and measure it over a form to see how it would conform to whichever particular style I was at that time making, pick out the hood so fitted or the various sizes and that particular style, give it to a hydraulic machine, who is also known as a hydraulic blocker. He would take it and block it or hydraulic block it, the hat, by taking this aluminum mold which has a rubber form that fits, this is the exact contour of the shape that I would want. The aluminum mold is reversed to a degree so that it fits sort of a male and female with it, the hat in between. He would put it in the hydraulic—I'd have to go back. He would first take the body and put it on what is known as a steam pot, live steam coming out thereof, pull it and stretch it to conform so that the dimensions on the brim would be even and exact with the mold that he was processing. Then, put it in the hydraulic machine with the amount of pressure that our particular factory pressures, close the machine after it sets, open it, remove the hat from the mold which remains in the machine, the rubber plug which is in here, he would knock off and put the hat aside. That would be the first process as to shaping of the ultimate shape and a man known as a sizer would take this hat, dip it into a solution. It is now shaped. We take the shaped body and emerse it into a solution, hang it up to drip off, after enough had dripped off, he'd hang it up to dry. After it had dried, which would take any length of time from a half-hour to overnight, it would go back to either the same hydraulic presser or another one who would go through the same process that the first hydraulic pressure went through, except that he would have most of the work cut out for him, repress it again and sent into the trimming room to be finished and blocked and completed.

The above testimony of defendant's own witness is not out of harmony with the testimony of plaintiffs' witnesses and the processes applied to the instant merchandise, as detailed in the interrogatories hereinbefore set out. In our opinion, when all of the testimony is considered and weighed, it establishes that the involved merchandise was blocked prior to importation.

In our consideration of this case, we accept the stipulation of counsel that the involved merchandise consists of "partly manufactured hats" and that any blocking operation performed upon this merchandise was applied to "partly manufactured hats" and not to hats, wholly manufactured. This record, however, contains nothing to indicate that there is any difference between the blocking of partly

manufactured hats and the blocking of hats, wholly manufactured. Naturally, there is a difference in the article to which the blocking operation is applied, in one instance, to a partly manufactured hat and, in the other, to a wholly manufactured hat. But, so far as the blocking *per se* is concerned, there is no indication that such operation varies according to the article to which it is applied, whether to a wholly manufactured hat or to a partly manufactured hat. If the blocking operation be applied to a partly manufactured hat, the resultant product would be a partly manufactured hat, blocked. If the blocking operation be applied to a wholly manufactured hat, the resultant product would be a wholly manufactured hat, blocked. The paragraph in question makes no provision for partly blocked hats, whether partly or wholly manufactured.

It will be observed that counsel have stipulated that, after importation, "* * * before becoming wholly manufactured hats, they must be subjected to a blocking process in the United States in the course of which blocking process in the United States they are stiffened with suitable sizing and then pressed into permanent shape by means of blocks and given their final shape and form in which they are ready to be worn as hats." With the question of what operations must be performed upon the imported hat bodies after importation to give them "their final shape and form in which they are ready to be worn as hats," we are not here concerned. The imported merchandise was not hats in "their final shape and form in which they were ready to be worn as hats," but hat bodies, or partly manufactured hats, to which certain blocking operations had been applied. Nor is it material that the blocking operations applied to the involved hat bodies, or partly manufactured hats, did not produce hats in "their final shape and form in which they are ready to be worn as hats."

The evidence shows that, during the sewing operation upon these hat bodies, an aluminum form is used and that, in this way, the operator controls the size and dimensions of the hat bodies, crown, and brim; that, after the sewing operation, the hat bodies are pressed with a hydraulic machine, using pressure and heat; that this is done to iron the hat bodies and adjust the sizes and dimensions; that, for pressure operations, an aluminum form is used "and for. what concerns the variation of the size and measure we use some circular sections to adjust the size of the form"; that "with the two operations of sewing and pressure we make the exact dimensions and sizes requested, but the pressure operation gives to the hats one hundred per cent exactness." "The hats receive a complete blocking operation. However, the shape that results after this blocking is not the shape that is usually worn. The hats can be *reblocked* on the shape desired by the customer as long as the dimensions are the same." [Italics

supplied.] This testimony was given by one who appears to be well qualified in the field of manufacturing and blocking straw hats and straw hat bodies. It is not contradicted.

Counsel for the plaintiffs contends that the case of *Donat & Co.* v. *United States*, 9 Ct. Cust. Appls. 162, T. D. 37997, has no application to this case, for the reason, among others, that the merchandise in the *Donat* case was hats and not hat bodies, and that the paragraph there involved was for straw hats, wholly or partly manufactured, blocked or not blocked, while the paragraph here under consideration provides for straw hats, wholly or partly manufactured, sewed, blocked or not blocked.

It is observed that the second paragraph of the syllabus in the *Donat* case refers to the merchandise as "Straw hats of 'Alpine' shape, known as 'bodies,' * * *." And again, in the decision, the appellate court refers to the testimony as follows:

* * * The witness testified that neither the crowns nor brims are finished ready to wear; that this work is done in America; that these are rough shapes known as "bodies," and are not in fact blocked; * * *.

The samples in the *Donat* case, as well as the samples in the instant case, are before us and have been examined by us. This examination supports the testimony of the witness and also the statement in the syllabus that the merchandise in the *Donat* case was straw hat "bodies," rather than hats. Paragraph 335 of the Tariff Act of 1913, construed in the *Donat* case, was as follows:

335. * * * Hats, bonnets, and hoods composed wholly or in chief value of straw, chip, grass, palm leaf, willow, osier, rattan, cuba bark, or manila hemp, whether wholly or partly manufactured, but not blocked or trimmed, 25 per centum ad valorem; if blocked or trimmed, and in chief value of such materials, 40 per centum ad valorem; * * *.

It will be noted that the higher rate of duty in the *Donat* case, *supra*, was applicable to hats, which had been blocked, and the lower rate of duty was applicable to hats, which had not been blocked, whereas, in the present case, the situation is reversed.

The lexicographic authorities give us little aid or assistance in determining the meaning of the word "blocked," when used in connection with the blocking of straw hat bodies. It is our considered opinion, however, that straw hat bodies that have been sewn on an aluminum form, whereby the operator controls the exact dimension and size of each hat body, including the crown and brim, and which are then pressed with a hydraulic machine, using heat and pressure, which gives 100 percent exactness to the size and dimension of each hat body, are blocked straw hat bodies within the meaning of said paragraph 1504 (b) (4).

With reference to the blocking operation giving to said hat bodies their exact shape and size, the manufacturer testified as follows:

\* \* \* The hats shipped as per Consular invoice No. 11182 of June 5, 1952 had the height of the crown 4¼ inches and a brim dimension of 2⅞ inches. The hats shipped as per Consular invoice No. 349, dated July 9, 1952 had the crown height as follows:

> 5 doz. height of crown 4¼ inches
> brim 2¾ inches
> 3 doz. height of crown 4¼ inches
> brim 2⅞ inches

\* \* \* \* \* \* \*

\* \* \* In both invoices there were shipped hats of different sizes. With invoice No. 11182 of June 25, 1952 there were shipped in two lots:

> 7 doz. size 7
> 8 " " 7⅛
> 7 " " 7¼
> 8 " " 7
> 8 " " 7⅛
> 8 " " 7¼
> 5 doz. assorted sizes from 6⅞ to 7½

With Consular invoice No. 349 of July 9, 1952, there were shipped:

> 5 doz. assorted sizes from 6⅞ to 7½

and 3 doz. assorted sizes—7, 7⅛ and 7¼

It will thus be seen that the blocking operations applied to these hat bodies gave to them the exact height of the crown, the exact dimension of the brim, and the exact head size of the hat bodies. Concerning the pressure operation, the witness testified that it "\* \* \* gives to the hats one hundred per cent exactness." This testimony shows quite conclusively that the blocking operation applied to these hat bodies is a treatment for the purpose and with the intent of bringing them to their final shape by blocking.

In the case of *Donat & Co.* v. *United States, supra,* in passing upon the question of whether certain straw hats were blocked, the Court of Customs Appeals made the following observation:

\* \* \* In the course of the blocking process in this country the hats are stiffened with suitable sizing, they are then pressed into permanent shape by means of blocks, and at the same time they are reduced to conventional and graduated sizes, such as 7⅛, 7⅜, or 7⅝, which is certainly an important if not an essential part of the blocking process. \* \* \*

\* \* \* \* \* \* \*

\* \* \* If the hats be shaped in part as an incident only to the forming of their brims, or if they be partly shaped by hand pressure or manipulation only, without any treatment for the purpose or with the effect of bringing them to their final shape by blocking, they would remain unblocked within the sense of the statute.

Attention is invited to the testimony that these hat bodies can be and are reblocked or repressed to the shape desired as long as the dimensions are the same. This testimony is not contradicted and

strongly suggests that the blocking treatment applied to these hat bodies before importation was for the purpose and with the effect of bringing them to their final shape by blocking, perhaps not for the purpose and with the effect of bringing these hat bodies to their final shape and form in which they are ready to be worn as hats, but none the less for the purpose and with the effect of bringing these hat bodies to their final shape by blocking. We have not been cited to any authority holding that, for a hat body to be blocked, it must be brought to its final shape and form in which it is ready to be worn as a hat. Such a holding would nullify the provision in the paragraph for hats, partly manufactured, blocked, for the reason that blocked hat bodies cannot be in their final shape and form ready to be worn as hats. If they were, they would be blocked hats and not blocked hat bodies.

It is our view that a hat body, or a hat, partly manufactured, can be, and is, just as effectively blocked by the application of the proper blocking operation thereto, even though such blocking operation does not bring the hat bodies to their final shape in which they are ready to be worn as hats, as the application of the proper blocking operation to an otherwise fully manufactured hat would bring that hat to its final shape in which it is ready to be worn as a hat. To hold that a blocking operation applied to hat bodies did not block said hat bodies, because it did not give to said hat bodies their final shape and form in which they are ready to be worn as hats, would be to completely ignore the provision in said paragraph for straw hats, partly manufactured, blocked. Any other construction of this paragraph would nullify at least one of its provisions. Statutes must be so construed as to give effect and meaning to all parts thereof. *Nicholas & Co.* v. *United States*, 7 Ct. Cust. Appls. 97, T. D. 36426; *Kenyon Co.* v. *United States*, 4 Ct. Cust. Appls. 344, T. D. 33529; *Goat and Sheepskin Import Co.* v. *United States*, 5 Ct. Cust. Appls. 178, T. D. 34254; *Nestle's Food Co.* v. *United States*, 16 Ct. Cust. Appls. 451, T. D. 43199; *Cassard Romano* v. *United States*, 19 C. C. P. A. (Customs) 191, T. D. 45294; *Kress & Co.* v. *United States*, 22 C. C. P. A. (Customs) 421, T. D. 47423.

For the reasons stated, we hold the straw hat bodies described on consular invoice No. 349, dated July 9, 1952, covered by entry No. I. A. 951101, and consular invoice No. 11,182, dated June 25, 1952, covered by entry No. I. A. 950361, to be blocked straw hat bodies and subject to duty at the rate of $2 per dozen plus 15 per centum ad valorem under paragraph 1504 (b) (4) of the Tariff Act of 1930, as modified, *supra*, as alleged by the plaintiffs.

To the extent indicated, the specified claim in said suits is sustained; in all other respects and as to all other merchandise, all the claims are overruled. Judgment will be rendered accordingly.